Mr. Banachor, am I pronouncing that right? You have reserved two minutes for rebuttal, so that gives you eight minutes to begin. And just give me one second to get settled. Okay, all right, you may proceed. May it please the Court. Your Honors, I'm Jason Banachor of Banachor Perkins, and we represent the plaintiff appellant in this matter, Robert Seiden, receiver for China Northeast Petroleum. At its core, the issues before you are about a foreign accounting firm that purposefully interjected itself into business in the United States, and is now claiming, that's fine, even if I did something wrong, you can't sue me. Well, the interjection, it seems like, was basically a 2010 letter that's a cover letter from the predecessor auditor, with then a retention letter for the merged entity, which is the defendant here today, right? Is there any other correspondence besides that? Yes, throughout- Is within October 2010, there's something attaching? Yeah, the initial correspondence was from Baker Tilly, the merged entity. Sent to New York, and CNIP at its New York address to its officers and directors for engagement for the audit. That was the initial contact and reach by Baker Tilly. It was Baker Tilly that reached out. As a matter of fact, that was, they actually submitted to the SEC, that was the point of the merger that they did. They stated, Baker Tilly stated to the SEC that it merged with another company for the specific purpose of expanding, quote, their already expansive auditing practice serving public companies in Hong Kong and the United Kingdom to the United States. Can I ask you, that letter you said was sent to New York. By that, do you mean that the address listed in the letter had a New York address? Yes. Was it emailed or was it mailed? I believe that one was emailed. Okay, so how do you know it went to New York? Well- Or let me ask you two things. How do you know it went to New York? How do you know it was read by anyone in New York? Those two questions. If there's anything in the record indicating either of those is true. Yes, no, there's the address is to the New York, to the officers. No, I know that, that's why I'm asking. No, right, but that's what I'm saying. It is in the email, and that's, I think, referring to some of the case law about them not being present and the use of technology. So now it is, I agree, it is hard to tell. They email to the address in New York. Well, no, they email to an email address. Right, with address to New York. An email address is not a mailing address. Correct. If you email someone's Gmail, their Gmail is not in New York. The person may be in New York, right? That's correct. But it can be accessed anywhere. So I guess my question too is, how do you know it was received or read by anybody in New York? I think as part of proving the prima facie case and part of the legal standard that CNEP was required to meet, which is that prima facie case and resolving all doubts in its favor, if you're addressing the letter to New York, I think it's reasonable to assume- You had discovery, didn't you? You had jurisdictional discovery? We did do jurisdictional discovery. Did you ask anyone if it was read in New York or opened in New York or? We did not do depositions or any oral discovery. Interrogatories? That's another way of asking. We did, basically we did requests for productions and got documents. Were you prevented from interrogatories? No, we're not prevented from doing interrogatories. So you want us to assume, and just to be clear that my colleagues question you, is that appendix 254, is that the document we're talking about? The engagement letter itself? Is that the February 3rd? Just want to make sure I have my eyes on the. Sorry. If I have the exact page on it, but yes, it's the cover letter and then you'll see there's an address of the- Chairman and CEO.  And that's the February 3rd, 2010. Well, there was actually two different letters. There was an amendment, there was a January 1st one sent, and then there was an amendment engagement letter sent, and I want to say that was three or four days later. So you may be looking at the February one. The February one was the subsequent letter that was sent. Engagement letter, it was sent February 1st. That's A-301, and the first one was sent January 29th, 2010. Is there any evidence that the CEO actually was in New York? It was addressed to the CEO. Correct. Is there any evidence that the CEO was? I thought that the evidence is that the majority of officers and directors were actually in China. I don't know if there's actually been any evidence in the record that there are any officers or anything in China. Wasn't the letter sent to China, too? No, the letter was sent to New York. Or it had a new, I should say, as the justice points out, it had a New York address versus being sent to New York. It had a New York address. And all the correspondence in the case, including the invoices when they first tried to get paid, were sent to New York at that New York address. But the New York address is sort of a mail drop, right? Something in the record indicated it was $1,600 a month rent, right? It was a Regis office. It's not just a mail drop. They had physical offices there. That was the assumption because Baker Tilly argued, but they pointed to the contract, but they didn't say it's just, they tried to say it's just a mail drop. But it was Regis rental offices, so it was basically a rental space that was used- But nothing in the record indicated who was there, how often they were there, what they were doing there, right? No, you're correct. The record indicates that that was the address that Baker Tilly thought they should send things to. Now I understand it's through email. But they didn't think the CEO was actually there, right? What? I'm sorry. They didn't think the CEO was actually in New York, right? This is basically a company with largely Chinese operations, right? They thought the CEO, is there anything to suggest that they thought or that the CEO was in fact in New York? Yes, that's why they addressed it to New York. I think- That's what I'm asking, not why, then what? Point us to the record, the part of the record that suggests that Mr. Wong Hung Joon, the CEO, the addressee actually was in New York. Yeah, I don't know if there's anything that says he walked in on a certain day or was there on a certain day.  Right. And is there anything ever? Could have asked. Could, nothing prevented you from asking that. Correct. But I think, and I'm getting close to the end of my time so, when they, as part of the standard, when you look at the evidentiary materials, which is the engagement letter, the invoices, the update, which was entitled management letter, they all have New York addresses on them, and within the light most favorable to the plaintiff. Because it is Baker Tilly's standard that they have to refute. So they have to prove it wrong once we make a culpable claim. And I think that's the issue here is the court missed that at the lower court's level, and held CNET to a much higher standard instead of a prima facie case, in the light most favorable to the plaintiff, and all doubts being resolved in our favor. When you look at it, the court actually ignored several things in the record, and said there was no indice in the record that anything was sent to New York. All the invoices were sent to China. Well, the only record that the invoices were sent to China were these emails. The email that the first invoice was sent to New York is undisputed, or has the New York address. And then direct it to send to China. Yes, and that would be part of the Hertz, the nerve center test of why it's a New York corporation. Because if you're sending something, Hertz is very clear, where the officers and directors control the actions from. So with New York, and I'm running out of time. No, no, it was more like you sent it to the wrong place. This ain't the nerve center. No. It wasn't like we are controlling things in New York. Please send it to our small outpost in Beijing. They just said, no, no, no, no, send them to China. No, because there was ongoing dialogue with the New York address, where the VP of Finance actually was going back and forth saying, we need more of this. We need more of that for some of the invoices, as well as the internal operations, which would go to Hertz and covering what has been done. Even the auditor was sending, the head of the audit committee was sending things to New York, saying we should do A, B, and C. And if not, then we're going to have a problem. And New York responded saying, no, we're not going to do that. And those are internal documents, A187 through A191. When you say New York responded, what do you mean? That's, it's, a lot of this was done by email. So there are addresses on the letter. These are formal letters. The head of the audit committee drafted a formal letter. That's Robert Bruce? Yes. The one whose letterhead has Portland, Maine on it? On the email. On the email, correct. So on his email for the engagement letter, I'm sending this back to you. And it says he's in Portland, Maine on the address block on the email. Right. But as to your honor's point, we don't know he was in Portland, Maine when he executed. I'm a broken record on that one, but.  I guess that's why I'm not sure. The only thing here is the Portland, Maine address. So I guess I don't see how you keep saying, well, it was the New York thing. It was New York. I know it said Maine. But the engagement letter. For Florida. I mean, I guess I don't see it. If the only thing on the piece of paper is Maine, I don't see where you're saying we should, or the district court should have inferred New York. I think I'm over my time. I'm happy to answer. You can answer.  Part of it is, so now you have contention. You have email with a New York address on it. And then you have a signature with a Maine signature address. That's the sender ranking a representative. Well, right. But what we're looking. More reliable than someone saying, I'm writing to New York. I'm sending a letter to you that has New York on it. That's not a representation of where you are. Only the person who's there can make a representation where they themselves are. I would think the stronger inference is your opponent's inference to say, well, the letter came from Bruce, and he had an address block for himself saying it's Maine. So you're saying, no, infer that when we sent it to someone, imagine they must have been the place I'm hoping they were. But when they represent where they're from, that counts for nothing. Sort of backwards, no? Well, no, because we're looking at it from the wrong way, if I can answer that. Once again, I'm over my time. Go ahead. But I'm happy to address it. When we're looking at purposeful interjection, we're looking at what did Baker Tilly do? What did Baker Tilly think? Not the response. As a matter of fact, one of the cases cited by Baker Tilly Galgay in their response on page 22 talks about the execution, if it fortuitously was executed in someplace else, that's actually irrelevant to where the contract was executed. So in Galgay, and it probably popped up for Baker Tilly because it says, oh, it was signed in New York, but New York's not the jurisdiction. Because the company sent an unsigned engagement letter to Philadelphia, and the court found that sending the unsigned, to get a signature to Philadelphia, was actually the jurisdictional, was more important jurisdictionally than where it was actually signed. So they found that it was executed in Philadelphia versus where it fortuitously being signed in New York, which would be here. If you're sending something to New York and it fortuitously is being signed somewhere else, that would fall under that case law. But that is not where it's executed. But still, Baker Tilly purposely sent an engagement letter with the New York address. They purposely sent invoices with the New York address. They purposely sent an update with a New York address titled management letter. And it was only at the direction, once they sent something to this New York address, there was direction saying either, okay, send the invoices to China, or we're going to do this. But they got responses or directions from the nerve center. And Hertz is very clear about that. Where you may have all the operations, I think Hertz says, all the operations may be in New Jersey. But if there's a couple people in New York, it may look weird and it may be an anomalous response for jurisdiction. But under that test, that is the nerve center, even if all the operations are not there. But, I mean, I guess I'd ask you to just consider, I mean, one of our cases, Bank Brussels-Lambert or Lambert. I mean, that's one where all of the work, all the legal research, all the writing was done out of state. And there were a few incidental communications that took place in the state. And why isn't this like that? Is there any suggestion that the audit work was done here? No, other than the ongoing dialogues. When they sent the update letter, they had an ongoing dialogue with New York. And I would say these aren't incidental communications. As a matter of fact, when you're reaching into New York, they reach into New York to create a contract. And they reach into New York to get paid. Those are quintessential communications of a contract. Those are not a few correspondence. You're getting your job and you're getting paid. Those are very, that's the heart of the contract now. This is the language from that case, Bank Brussels-Lambert, which is where the firm performed all its legal research and writing services in preparing its opinion out of state, and its communications with the plaintiff involved either the negotiation of the original agreement for legal services or editorial comments during the process of preparing a final opinion. That's, and that wasn't enough. This seems like, it sounds like that's more than what we have here, isn't it? No, I would say we have more in this case. For one, there was the engagement letter, that's the second engagement letter. There was the primary invoice that was sent to- Can I just ask real quick on the record on the engagement letter? Yeah. I think the second engagement letter, February 3rd, 2010, is that the one that you're referring to? Let me look, I have A301, I have it marked as A301. Let me look at what I have marked there. This one is dated, it's actually dated February 1st on Baker Tilly Letterhead, Appendix 301. 301, okay. Yes, and that's dated February 1st. Yeah, I just wanted to get my eyes on it, thank you. Yeah. All right, well you've reserved some time for about two minutes, so we'll still let you have that. In the meantime, we will hear from Ms. Tolbert, or Tolbert, how do you pronounce it? We're just good old Americans, it's just Tolbert. So Ms. Tolbert, you may proceed. Thank you, your honors. May it please the court, this case requires the court to determine whether a Hong Kong audit firm is subject to personal jurisdiction under New York's long arm statute, where it was retained to audit the financial statements of a Nevada corporation with operations exclusively in the People's Republic of China, and where the undisputed fact showed that no employee or agent of the audit firm was ever present in New York in connection with the negotiation, execution, or performance of services under the audit agreement. Plaintiff has argued that this court has jurisdiction over Baker Tilly solely under New York CPLR 302A1. Therefore, it was plaintiff's burden to present an averment of facts that, if credited, would suffice to show that Baker Tilly transacted business in New York. That is, that it purposefully availed itself of the privilege of conducting activities in New York. And in analyzing whether a plaintiff has presented a sufficient averment under 302A1, this court generally looks to the list of factors identified in agency rent-a-car, which is exactly what the district court- I guess that's not the exhaustive list, and several of those don't even apply here, right? That's a franchise case, and so I know that's what the district court spent all its time on, and the briefs generally do, too. But your view is that that's a test we have to follow in this case? Well, Your Honor, I don't think this court has to follow it. And in many cases, they look just generically to the totality of the circumstances. But I will say that in the Continental Industries Group case, which this court issued in 2014, Rosenblatt v. Kootz, a 2018 opinion from this court, the court did affirm the district court's opinion by going through each of the agency rent-a-car factors, and then the location of performance, just as those were set out in the agency rent-a-car case. So- On the first factor, which asks if the customer, the client here, you, sorry, the other side is a New York corporation. And the district court, I think, sort of discounts the possibility of taking into account where the principal place of business is, and asks only where the state of the corporation is. Is that, I mean, if we are sort of marching through those factors and thinking about the first factor, what's your understanding of precedent or authority on how to think about that? Well, your honor, the Southern District cited to another Southern District opinion for its holding that the location of incorporation was sort of dispositive on the question of whether it's a New York corporation. Plaintiff didn't cite to any cases that used the nerve center test for purposes of 302A1. Plaintiff had cited to the Worry Bank case, which deals generally with corporate residency. But that case, and then also all of the cases that it relied on, were specifically in the context of New York's borrowing statute, trying to determine where and when a claim accrued. And so those aren't specifically applicable either. So, obviously, this is a case where the court could articulate what the clear standard for that is, and it could be state of incorporation. I think in this case, where the form 10-K that was filed by CNET stated so clearly that the company's principal headquarters are in China, and it identified the New York office so clearly as an administrative office. And as your honor- Principal executive office is the word they used. In the 10-K. Well, on the cover of the 10-K, it says principal executive offices. And that's obviously what the Hertz case said specifically was insufficient to establish the nerve center. But it seems like there's a bit of gamesmanship going on, right? Trying to portray yourself as an American corporation with your principal executive office in New York, when that might suit. And then when actually you're on the other end of litigation, then you can say, no, no, we're not a New York company, we're a Chinese company. Well, I mean, I don't know what CNET's motivation was there, your honor. And I'm not sure they do either, right? Right. I can imagine that a Chinese firm wants to portray its New York office as somewhat grander than a Regus office motel arrangement. But I think- But if you direct, if they direct, it's not you, if they direct correspondence there, because it is the principal executive office, and that's where contracts go, then, I mean, does it account for something? Well, I think, as your honors have observed, that what they did was they generally affixed the address of the New York office to official correspondence. That, I think, nobody disputes. It's there on the letterhead. We cited to several cases in our briefing, both below and in this court, where the court found that the use of an address in corporate letterhead was insufficient to establish the location of the company's headquarters, where other factors show that the board members controlled the firm from another location. In this case, we've attached the board minutes of CNEP's board meetings, which were all held in China, because that is, as the 10K indicated clearly, where all the officers and directors were. I think Mr. Bruce was an independent board member, and he was in Portland, Maine. The majority of the other board members were in China or in Hong Kong. I mean, it's kind of an interesting group. There are people who were Australians who were located in China. But anyway, everybody was essentially outside of the U.S., except for Mr. Bruce, who was an independent board member and was in Portland, Maine. So I think, given the fact that the board minutes showed that the board meetings were always held in China, that there isn't any reasonable basis for an argument that the nerve center of the corporation was in New York, where there was a one-room office that was, you know, essentially a mail drop. I think the lease makes clear that they had access to Regas's kitchen and a phone, but otherwise they had simply one office and not even a dedicated office. They had the right to use a single office, and it would be whatever one was available in Regas that day. I think any inference that that was a corporate headquarters of a company whose oil exploration activity was located entirely in the People's Republic of China would be unreasonable. But I do think, in this case, it almost doesn't matter, because, as this court said in Continental Industries Group v. Equate Petrochemicals, which is at 586 Federal Appendix 768, the finding of a contractual relationship with a New York corporation does not weigh strongly toward finding that the defendant transacted business in New York where the contract concerned services to be performed outside of New York. And as Your Honor has already raised, this principle is clearly shown in the Bank of Brussels Lambert opinion. In that case, a consortium of five banks domiciled in New York retained a Puerto Rico law firm for an opinion regarding the validity of security interest in a Puerto Rico oil refinery. Despite the fact that the banks were indisputably New York residents, the court concluded that the law firm had not transacted business in New York because the law firm was incorporated and located in Puerto Rico. The law firm performed all of its services in Puerto Rico, and no employee or agent of the law firm had ever entered New York or was required to be physically present in New York to perform those legal services. And this case really is quite similar to Bank Brussels Lambert. And consistent with that opinion, 302A wouldn't permit the exercise of personal jurisdiction over Baker Tilly, even if CNEP were a New York corporation, because Baker Tilly is incorporated and located in Hong Kong. Baker Tilly performed all of its audit services in China and Hong Kong, and no employee or agent of Baker Tilly was ever present in New York, either to negotiate or execute the audit agreement, or to perform any of the audit services. Well, I mean, your adversary suggests that there was an ongoing dialogue that took place with correspondence to New York, and I guess a version of an audit report was sent there, and this is October of 2010? Well, I think it is undisputed, or at least indisputable, because the records are in the record, that when Baker Tilly completed its audit opinion, it was sent to CNEP's outside counsel in San Francisco, and then CNEP's outside counsel took care of whatever filing needed to be done with that opinion. There was a letter identified by the receiver as this, I'd call it the continuing dialogue letter, that was sent in October, and I would note first that the letter isn't signed and it's marked draft, so it's not clear that the letter was actually ever sent to anybody. The entire audit file was produced in this case if there was a copy of that letter that was signed and dated, I think it would have been presented by the receiver, and again, just in line with the discovery, it's worth pointing out that the receiver here is CNEP and has access to all of CNEP's records, and access, presumably, to all of CNEP's employees. Baker Tilly produced its entire audit. You think all their employees? I mean, that's part of the reason we've got a receiver, right? Well, surely, but they stand in the shoes of CNEP here and so would have the right to control all of CNEP's corporate records. If New York was indeed the corporate headquarters of CNEP, that would be quite a volume of corporate records indeed, and I'm sure would be sufficient to show if Baker Tilly had these extensive contacts with New York. I would say that on the receiver's, I mean, the receiver's primary argument, I think, is this idea that CNEP is a New York corporation, and then the secondary argument is that Baker Tilly somehow reached into New York when it merged with another Hong Kong audit firm and sort of took over its U.S. book of business, and I would just point out that the plaintiff doesn't aver facts that in merging with that Hong Kong audit firm, Baker Tilly was targeting New York corporations for its audit services. Plaintiff avers only that Baker Tilly was targeting U.S. firms generally, and so even accepting the plaintiff's averments is true. They don't show that Baker Tilly was looking for New York merger candidates or that it was purposefully targeting New York companies for its audit services. As to the invoice issue, and I know I'm out of time, I would just add that I think the parties agreed that Baker Tilly sent its initial invoice to CNEP's New York office, and the parties also agreed that after it did so, CNEP instructed it to send its invoices to China and that Baker Tilly complied with that instruction. It was also undisputed that CNEP paid Baker Tilly for its services from its bank account at the Beijing office of the Industrial and Commercial Bank of China, so all payment was settled and made in China. Very quickly, I think you moved on two grounds, the first of which was that there was no transacting that took place at all in New York, and the other was that the claims here don't arise from those transactions, even if one could characterize them as in New York. The district court didn't go off on the second one, and it was a pretty small piece of your brief. In some ways, it strikes me that that's an easier call, but you tell me. Well, Your Honor, my recollection was not that we had moved to dismiss on that ground. I think if the court were to somehow find that this was a New York transaction, that the solicitation and entering into the agreement was a New York transaction, then I think to the extent that the claims here are based on the audit services performed under that contract, the arises out of prong would be easier to show. The other basis we had raised below was the due process question, and the district court did not reach that issue. And obviously, in the Leachy case, the second of the two Leachy cases, this court held that there is likely to be substantial overlap between 302A1 contacts and due process contacts, but the court stressed that that did not mean that there was not required to be a separate analysis in every single case before jurisdiction was upheld under the due process clause. And so since the district court didn't reach that issue below, there wouldn't be an ability to hold that jurisdiction was proper without a resolution of that issue. All right. Thanks very much. We'll now hear from Mr. Anacur for two minutes of rebuttal. I may have pleased the court. Just to address a few things that were said. One on the fact that the ongoing communications or update letter wasn't signed. It's actually from discovery that we got from Baker Tilly. There's actually on A347, it says issued October 8th, 2010. So that actually was an issued letter sent to the address. Well, that's what it says on it.  And anything else in the record indicate what that means, who wrote it or anything like that? We don't know who wrote it because we got it from Baker Tilly. So I think there the logical assumption would be that that is Baker Tilly's notation because we got the document from them. And that document's also telling because it says in accordance with the terms of our engagement letter. And this is part of a continuing dialogue, as I said, and it's a management letter addressed to New York. A few other things when we were talking about the execution. Baker Tilly does not actually make an affirmative fact that the document was executed in Maine. Even if that is. So some of these... So, Hannah, you're the receiver, right? You represent the receiver who's standing in the shoes of the corporation, right? Why do they not have... Why is CNET receiver not able to go to the members of its audit committee or its board of directors, Mr. Bruce, and say... And produce to this court and say, yeah, I was in New York, or I was in Maine, or I was in Bermuda. Why are we worrying about whether it could have been... Somehow it could have been intuited in discovery from the other party when he was working on behalf of CNET? One is, as a receiver, unfortunately, they do not get full cooperation and generally not from the bad actors. And a lot of times a receiver is put into place, and that is a lot of the law about Posner and statute of limitations, that you don't step into the place of the bad actor. And a lot of times it is a receiver because the bad actors are controlling the company and are put in. It is a Chinese reverse merger that took money from the United States, moved it to China, and never came back. So part of that is... That's the bane of existence for a receiver is to have that. And if I may do... As I noticed, I'm through my two minutes, but I may say one other thing with the permission of the court. Yes. Okay. I think you have to look at this as the point of view more when you reach... Are you reaching into New York? Well, they're saying they reach into the US. Well, yes, because they had companies around the US on that list. CNET happened to be in New York, and they purposely told the SEC that was what they were doing. They took affirmative action to get an engagement, to get paid, and to take all that action with a New York company. And the argument that it's circumstantial evidence because it's just on their letterhead, we're not talking about CNET's letterhead. They make a big deal about letterhead's not enough. We're talking about Baker Tilly's letterhead. Baker Tilly sent it. You're asserting that your personal jurisdiction on the basis of specific personal jurisdiction. So the fact that even if CNET was a New York corporation, that's not enough to get you home, right? You need to show other contacts. Correct. And so looking, as you discussed with the agency, if you're looking at the agency factors, I agree with you, I don't think that's dispositive because New York is very clear one single act is enough. But if you're looking at, so the execution of the agreement, that's the second agency factor. Galgay shows you that execution of the agreement in that case was where the document was, unsigned document was sent. And the first agency ongoing with New York, that would be two. And then communication, very interestingly enough on that factor is the court just ignored anything that they had. And on the fourth factor, the court said, it's true that requirement correspondence was required to be sent to the company. But we have to turn to the record because it doesn't say where the company is located in that letter. Then the court said it sounded nothing indicative in the record that communications had to be sent to New York because the invoices were sent to China. Well, that's missing that it was sent. There's nothing in the letter that requires they be sent to New York, right? Not specifically. That's why the lower court said you must turn to the record and look at what's indicative. And so they sent the first invoice to New York and then under Hertz, they said we cited nothing that is the nerve center. Hertz is the test about the nerve center. Bocephalus, what the court cited actually, that case is wholly inapplicable because it doesn't even discuss the location. It says location is irrelevant because there is no contract. So that Bocephalus court where the court said it's the state of incorporation never actually got to that because it said there's no contract. So it's irrelevant. The court actually quoted that in its order saying it's irrelevant where it's located and it's citing Bocephalus, but that case wasn't applicable. So when you're actually going through the agency factors and you apply the right standard because what the court tried to do and what they said is it's akin to a summary judgment. They held CNIP to have to refute everything, but Melnick is very clear. Prima facie case, it is Ben Baker Tilley's job to refute. So prove wrong all the other allegations. That's the clear standard under Melnick. But it's also still not clear to me why your claims, which really sounded fraud and negligence, arise from the transaction that took place in New York, which is really just sending a retention letter. If we limit it to that, how do your claims arise out of that? It's not fraudulent inducement. It's not like there was a fraudulent letter that laid out false statements that induced them to do something, right? No, the claims sound in contract because they had contractual obligations. They were auditing a U.S. listed company using GAP. Right, but there's nothing in the letter that says New York law is going to be the basis for resolving contract disputes or a forum. There's no forum language either, right? That's correct. And the agency court says the choice of law sort of is the least important part of the factors. But it does arise from the transaction is they wanted to get paid. They sent the invoices to get paid for the work that was done. They had an engagement letter. And it's because the claims arise out of contract and they breached the contract because they didn't meet the standards that were set out in the contractual basis. And that's what the suit was on. Those are contractual claims. Where were they when they didn't meet those standards? Well, because technology, you're right, they never entered New York and they never did anything in New York because they didn't have to. But I think the case law, and we cited in our briefs are very clear that you can do an extensive amount of business even in New York without ever setting foot in New York. You can have an ongoing relationship. As you said, this was not, we did something for one month. They had an ongoing contractual relationship from January through the time the audit was, I think it was 10 to 11 months of an ongoing relationship with a New York entity. And so that's the ongoing relationship. And in today's day and age, they wouldn't have to set New York to do this if there wasn't email. If there wasn't, they would have had to have mailed it to a New York address. If they couldn't hop on the phone or do Zoom or any communications, they would have had to have come to New York. I think that's the point of the cases on technology and that you can reach into a state and never appear there. Well, we will reserve decision. Thank you both.